MARTIN O. FENDER, APPELLANT, V. ROBERT M. REED ET AL., APPELLEES.

12 N. W. (2d) 98

FILED NOVEMBER 26, 1943. No. 31550.

*Harry R. Ankeny*, for appellant.

*Beghtol, Foe & Rankin*, contra.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, CHAPPELL and WENKE, JJ.

SIMMONS, C. J.

The plaintiff, a judgment creditor of the defendant, Robert M. Reed, by petition in equity, seeks to subject two pieces of land to the satisfaction of his judgment. The trial court denied his petition as to one piece of land and granted it, in part, as to another. Plaintiff appeals. We affirm the judgment of the trial court.

From a review of the record, independent of the findings of the trial court, we find the following factual situation.

James is the oldest and Robert the youngest of a family of 8 children. The mother died when Robert was an infant. The father died in Robert's early minority. When Robert was about 10 years of age he came to live with James and with one exception to be mentioned later, lived with James until his, Robert's, marriage in 1935. In the partition proceedings of the father's estate, Robert was awarded a 160 acres of unimproved land in Lancaster county. There were estate debts which had to be paid. There was no personalty to distribute.

Although not Robert's legal guardian, James took care of his person and property, received the income from the property, allowed him spending money, paid his debts and cared for Robert to the apparent satisfaction of Robert and the other brothers and sisters. With one exception, to be now mentioned, this arrangement was followed until Robert's marriage in 1935. James kept a separate bank account of Robert's funds, but otherwise made no record of income or outgo.

Another brother Lawrence was married and lived in Box Butte county. In 1930, at Lawrence's solicitation and without advising with James, Robert went to Box Butte county and lived for about a year and a half with Lawrence. While there, Robert appears to have handled his own finances. While there his brother Lawrence's wife and Lawrence, on June 11, 1931, executed notes and a mortgage securing the same on land, the title of which was in the wife. Robert

signed the notes as an accommodation maker. On June 16, 1931, the plaintiff purchased the notes and mortgage. The makers defaulted on interest and principal due June 11, 1932. On November 19, 1932, plaintiff started foreclosure. Robert at that time had returned to James' home. Service of process was had on him there on November 25, 1932. James knew of this action and assisted in securing the services of an attorney for Robert, but it does not appear that James paid any further attention to that litigation. The foreclosure action went to decree on October 30, 1933. On July 8, 1939, a deficiency judgment was entered against Lawrence, his wife and Robert in the sum of $3,013.26. This judgment was transcribed and filed with the clerk of the district court of Lancaster county on July 26, 1939. Execution was issued October 7, 1941, and returned the same day wholly unsatisfied for want of lands, goods, etc., of the "defendant" upon which to levy. Robert knew of the motion for the deficiency judgment before it was entered in Box Butte county. James did not know of the deficiency judgment until October, 1941. It is this judgment which is the foundation of plaintiff's action.

In 1927, James determined that it was for the best interests of Robert that his 160 acres be improved. James placed a complete set of improvements thereon at a cost of about $5,500. James paid from his own funds some $2,750 of this amount, contributed his own services of the estimated value of $250 or $300 and paid the remainder from Robert's funds. No detailed record or accounting was made at the time of these expenditures, although at the trial receipts were produced, issued to James, for materials paid for in the sum of $1,700. It further appears, from general statements in evidence, that Robert, when living with Lawrence, mortgaged this land to secure a loan and turned the proceeds of the loan over to Lawrence. This was done without the knowledge of James. In February, 1932, the mortgage on Robert's 160 acres was in default and taxes were in arrears. James negotiated a sale of this 160 acres, through an agent, to one Arres for $19,500. Robert exe-

cuted the deed. The transaction was closed February 13, 1932. James testified, and the bank records support his testimony, that he received $8,551.17, as the net of the purchase price after the taxes and incumbrance had been paid. This was deposited in Robert's account. James later checked out of Robert's account $237.50 agent's commission and $700 to the tenant to get possession for the purchaser. These receipts are in the record. He also paid out $100 attorney fees. James, on February 20, 1932, withdrew from said account the sum of $3,000 and on February 25, 1932, withdrew the sum of $5,800 in currency. On March 15, 1932, James redeposited $1,000 of this amount in Robert's account. It is plaintiff's contention that this $1,000 was an additional part of the purchase price. This contention will be discussed later herein. From this money James paid accounts of Robert's which he fixes at a total of $265 and bought Robert two teams and an automobile and other property totaling $1,055. James also took the amount which he had paid on the cost of the improvements in 1927. He testified as to other items and that Robert was then owing him more than the $5,800. He further testified that the $3,000 withdrawn was "for what was coming" to him from the payment on the farm purchased from Lawrence.

On April 26, 1929, James purchased 80 acres from Lawrence and the deed ran to Robert and James, each for an undivided one-half interest. The purchase price was $10,-000. The defendants borrowed $6,000 and secured the payment by two mortgages, one for $5,000 and one for $1,000. $4,000 was paid in cash. James paid them from his own funds $3,100 and from Robert's funds, $900. The $1,000 mortgage was released by instrument dated July 7, 1933. The $5,000 mortgage was released by instrument dated April 7, 1934, and on that same day a mortgage was given to one Wetenkamp for $2,000. James paid the amount to reduce the indebtedness. He also paid the taxes and the interest from his own funds. In 1941, Robert asked James to buy his interest. James did so paying $100 in cash and

giving his notes for $900. $300 was paid on the notes that summer and the balance of the notes were unpaid and in the hands of a third party at the time of the trial. By deed, dated and acknowledged March 20, 1941, Robert conveyed this undivided half interest to James Reed and wife for a consideration of $1,000. The deed was recorded October 10, 1941.

During the period of the joint ownership of this 80 acres, Robert and James each farmed 40 acres. James paid all of the taxes and all of the interest from his own funds. The plaintiff prayed that this deed of March, 1941, be set aside and Robert's interest in the land subjected to plaintiff's judgment. James conceded that the deed should be set aside, but contended that he should be protected in the taxes and interest paid subsequent to the 1932 settlement on Robert's share and in the purchase price paid to Robert. The trial court held that the interest and taxes paid retired liens, superior to plaintiff's judgment, that the deed should be set aside but gave James a lien on Robert's interest for the taxes and interest paid on Robert's share, and decreed that it was superior to plaintiff's lien. Plaintiff appeals from this part of the decree.

On December 8, 1932, James purchased 80 acres of land from one Bateman, paying therefor the sum of $5,100. There is no evidence that the $5,100 used to purchase this land was money which had been withdrawn from Robert's account ten months before, or that it had any connection with that fund. James testified that it was his practice to keep sums of currency on hand. James, at the time of the trial, did not remember whether he paid the purchase price in currency, check, or draft but testified positively that it was paid in full from his own funds. James rented this land for one or two years after it was purchased, received the rents and paid the 1933 taxes. This farm had on it some, not too good, improvements. When Robert married he moved upon this farm and has lived there since. The testimony is that Robert was to pay the taxes and cash rent. James testified that he "figured" about $250 cash rent but

"my agreement was he should pay me $150 a year." Robert was unable to make the farm produce enough to live upon and pay rent. He did not pay the rent. Robert paid the 1934 to 1937 taxes, inclusive, the 1935 receipt being issued "J. R. Reed by Robert Reed." The remaining taxes have not been paid. Robert sold what crops were available for sale and kept the proceeds. Robert did not like the location of the well and with James' approval put down a new well and windmill, paying for the same out of the proceeds of the crops. It is plaintiff's contention that this land was bought with Robert's money, held by James for Robert's benefit and the title taken in James' name for the purpose and with the intent of the defendants "to hinder and defraud plaintiff and to prevent the enforcement of his said judgment." Plaintiff prayed that the deed be canceled and the land subjected to his judgment.

As to this land purchased from Bateman December 8, 1932, the trial court found that it was purchased by James for his own benefit, paid for from his own funds, that it was James' property and that James was not holding it for Robert as trustee nor in any other manner. The trial court quieted title to this 80 acres in James, free of all claims of right or interest therein made by the plaintiff. This the plaintiff claims to be error, insisting that it was a transaction between close relatives, is to be carefully scrutinized and its good faith clearly established and that the burden is upon James to establish that good faith and that he has not done so. Plaintiff also advances the contention that James as the agent and as trustee of Robert's money and property has the burden of showing that he is entitled to the credit he claims. While questioning the applicability of the rules to this case, defendants state their willingness to have the facts tested by those rules. The question then becomes one of fact.

Plaintiff does not contend that Robert did not have the right to pay his debts to his brother James but rather contends that such debts did not exist and accordingly were not paid and that these transactions were conceived and

carried out with the intent to hinder and defraud the plaintiff and to prevent the enforcement of his judgment.

To find for the plaintiff it would be necessary to hold the testimony of James to be false as to the debts and the disposition of these funds in settlement of a long standing running account. It may be that the figures testified to, do not exactly balance. This is not an accounting action between Robert and James. Robert is not here contending that James made an improper disposition of his funds. So far as this record discloses Robert has at all times approved the handling of these funds and their allocation. He here testified repeatedly that James owed him nothing. To find for the plaintiff it would be necessary to hold Robert's testimony to be false also. True, the testimony of these two brothers is largely uncorroborated by documentary evidence. It is also uncontradicted by other evidence. Plaintiff contends that there are contradictions in the record. We will discuss those stressed in the argument.

James testified that the total net amount received from the sale of the 160 acres was $8,551.17 which is shown to have been deposited in Robert's account on February 13, 1932. Plaintiff contends that the amount actually received was $9,551.17. On cross-examination of James, plaintiff produced checks, 5 in number, given by Mr. Arres, totaling $19,500. One was payable to Robert for $8,551.17. Another dated February 3, 1932, was made payable to a real estate agent for $1,000. This is shown endorsed by the agent and paid February 5, 1932. James was asked if this did not represent "the first payment" to the agent "on this purchase price." James answered that he did not recall but "it could be." There is no evidence that that $1,000 ever was paid to James or Robert. The undated receipt of the agent is in the record showing receipt of $237.50 "balance in full for sale of NW-35-10-7." Robert's bank account ledger sheet shows a check for $237.50, paid February 15, 1932. On March 15, 1932, James deposited $1,000 in Robert's account. Plaintiff argues that this $1,000 was the "first payment" to the real estate agent. James testified that he put

that $1,000 back into the account out of the $8,551.17. On that same day (March 15, 1932) the bank account shows a withdrawal of $700, and in the record is the receipt of the tenant for $700 dated March 15, 1932, "In full settlement for vacating the premises." The balance of the $300 was left in the account of Robert and so far as this record shows was used for Robert's benefit. The record does not support plaintiff's contention that James received $9,551.17.

James also testified that he withdrew the $3,000 on February 20, 1932, "for what was coming to me from the payment there of Lawrence on that farm." It will be remembered that this farm was purchased in April, 1929. At that time it was mortgaged for $5,000 and $1,000 to secure money to apply on the purchase price. Plaintiff argues that James' statement cannot be true because he concludes the payments had not been made on the mortgages in February, 1932. To support this contention plaintiff cites the record that the $1,000 mortgage was released July 7, 1933, and that the $2,000 mortgage, to a new mortgagee was not given until April 7, 1934. This evidence does not show when the indebtednesses were paid which were secured by the mortgages given in 1929.

James testified that he paid the $1,000 mortgage before it was due. No date of payment is shown. He is shown further to have paid interest due on the $5,000 mortgage on December 9, 1932, and June 6, 1933, each receipt being for the sum of $125. The interest rate is not shown in the mortgage. However assuming as plaintiff contends, that the indebtedness secured by the $1,000 mortgage was not paid until July, 1933, and the indebtedness secured by the $5,000 mortgage not paid until April, 1934, plaintiff has not been harmed. The record shows that the indebtedness was reduced $4,000 and the testimony of James is that $2,000 of the money he took from Robert's account in February, 1932, went to that payment. Even if James had not then made the payment he was obligated to do so. The trial court held that plaintiff's judgment was a lien upon that land, and these payments went to reduce the mortgage liens which

were ahead of his judgment. That $2,000 of Roberts' has gone to the benefit of the plaintiff.

On May 9, 1932, Robert made his intangible tax return showing "bank deposits" $7,000 and again on May 15, 1933, he returned "bank deposits" $3,000. James in his intangible tax return made April 10, 1931, did not show these debts of Robert's to him. We do not consider these returns to be controlling on the issues presented by this appeal.

Plaintiff further contends that the testimony of James is discredited because James did not offer the records of his own bank account in evidence in corroboration of his own testimony and argues that the failure to do so raises an inference that those accounts would have established the fact that James' testimony is not true. The record shows that the cashier of the bank where James did business was subpoenaed and testified in rebuttal for plaintiff. He testified that he had in the courtroom all of the ledger sheets of accounts of Robert and James which the bank had. A recess was taken to permit plaintiff's attorney "to examine the records produced." The cashier was not thereafter examined as to those accounts nor were they offered in evidence. We see no merit in this contention.

It is to be remembered that these defendants were testifying as to events which had occurred 10 years before. The trial court saw them as they testified and heard their testimony. The trial court accepted it as true. We see no reason for doing otherwise.

Plaintiff, in argument, poses the question as to why James withdrew this money from the bank in February, 1932, put it in a safety box and paid some of the obligations in cash. Without any inference of fraud the answer may be found in the economic conditions that existed in Nebraska in February, 1932. Plaintiff argues that it was done as a part of a secret plan and scheme to dispose of this money so that no record could be found. Plaintiff's contention is that this record from the sale of the 160 acres down to date shows a fraudulent intent and purpose on the part of these two brothers to hinder and defraud plaintiff and to prevent the enforcement of his judgment.

To hold for the plaintiff it would be necessary for us to find that four months before there was a default in the Box Butte county indebtedness and over seven years before there was a deficiency judgment entered there, these defendants were clever, scheming and foresighted enough to anticipate that judgment, sell the 160 acres and convert the proceeds to cash and to hide the cash. Further it would be necessary to find that thereafter when foreclosure action was brought in Box Butte county and two weeks after service of summons upon Robert, these two brothers, to further accomplish their intent to hinder and defraud, brought the money out of hiding, purchased real estate with it, immediately placed the deed of record and covered up only to the extent of placing the title in James' name instead of Robert's, where it remains to this day. It would be further necessary to find in effect that while they were clever and foresighted enough to do those things, yet they, having such a fraudulent intent, were dumb enough to leave title to an undivided half interest in 80 acres of land remain of record in Robert's name in the community and county where he lived, throughout this whole period and for over two years after a deficiency judgment was rendered.

The facts of record do not warrant any such findings. Any such inferences are affirmatively overcome by the evidence of the defendants. If this is Robert's land it should be subjected to the payment of plaintiff's judgment. If it is James' land it should not be. We hold on the facts that the land is James' and as to the 80 acres of land, affirm the judgment of the trial court.

We now return to the matter of the lien awarded to James for taxes and interest paid upon the land held jointly, which the trial court decreed was a lien superior to the lien of plaintiff's judgment.

Plaintiff does not assail the finding as to amounts. He contends that there is no evidence other than James' testimony that he paid these amounts from his own funds and not Robert's funds. We have considered the same reasoning in the prior sections of this opinion. This argument

overlooks the fact that these payments of interest and taxes were made by James almost entirely after Robert had married and was transacting his own business and handling his own funds.

It is next argued that the payments were voluntarily made; that one cotenant may pay taxes upon his undivided interest and is under no obligation to pay the taxes of another cotenant; that there was no agreement for the repayment of these taxes and no debtor and creditor relationship established. This argument overlooks the essential relationship between these two brothers, the dependency of Robert upon his brother James, and the brother's burden that James had carried throughout the years. Under such circumstances we do not think that the hard and fast rules relied upon by plaintiff should be applied. Justice requires that courts recognize the circumstances under which these payments were made. This court has long followed the rule, "The doctrine of subrogation is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice and to do equity in the particular case under consideration. It does not rest on contract, and no general rule can be laid down which will afford a test in all cases for its application. Whether the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case." *Equitable Life Assurance Society v. Person,* 135 Neb. 800, 284 N. W. 260.

Plaintiff's argument as to the payment of the taxes and interest also overlooks another factual situation. The two defendants, as tenants in common, were the makers of a mortgage to secure the payment of $2,000. According to the mortgage terms the makers were liable for the payment of the interest and required to pay the taxes. By its terms, if they failed to do so the entire sum secured by the mortgage could have been due and collectible at the option of the mortgagee. James was required to pay the taxes on Robert's share and interest on the common obligation. He could not protect his own interest in the property except by making these payments.

In *Winn v. Winn,* 131 Neb. 650, 269 N. W. 376, this court determined a case where a tenant in common had paid taxes on the common property. We held that the tenant in common who paid the taxes was entitled to maintain suit for contribution against his cotenants for their proportionate share, and granted him an equitable lien against the interests of his cotenants.

There appears to be no merit in this contention of the plaintiff.

Plaintiff further calls our attention to the testimony of James that when he purchased Robert's interest in the 80 acres, in determining how much he would pay Robert, he, James, took into consideration the fact that he had been paying the interest and taxes. Plaintiff argues that when the conveyance was made by Robert to James the obligation for taxes and interest was settled and further that James' claim to a lien merged in the fee when it was acquired by James. Plaintiff appears to have overlooked the fact that the conveyance from Robert to James has been set aside by the trial court. The plaintiff is not entitled to rely upon a settlement and a merger, where the transaction at plaintiff's request has been set aside and held for naught.

The judgment of the district court is affirmed.

AFFIRMED.

YEAGER, J., participating on briefs.