RICHARD C. WEBBER, APPELLEE, v. HARRY A. SPENCER ET AL., APPELLEES, KATHERINE R. SHANKLAND ET AL., APPELLANTS.

27 N. W. 2d 824

Filed June 6, 1947.    No. 32187.

482

*Ginsburg & Ginsburg,* for appellants.

*William Niklaus,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is a suit to quiet title in the plaintiff as owner of Lot 8, Block 2, Second East Park Addition, Lincoln,

Nebraska, against Harry A. Spencer and the unknown heirs of W. R. Shankland, also known as William R. Shankland who will hereafter be referred to as W. R. Shankland, and Celia R. Shankland, husband and wife, deceased, defendants. The plaintiff claims title as purchaser at a mortgage foreclosure sale, and alleges in substance in his petition that on November 23, 1943, the defendant, Harry A. Spencer, caused to be filed in the office of the register of deeds of Lancaster County, a certain affidavit wherein said defendant set out a copy of a contract providing for the sale of the property heretofore described, dated July 1939, between W. R. Shankland and Clifford L. Rein; and further alleges that such affidavit casts a cloud on the plaintiff's title. The petition also alleges that the estates of W. R. Shankland and Celia R. Shankland have never been administered, and all right, title, and interest, if any, of the defendants and each of them, is junior and inferior to the plaintiff's title; and prays judgment quieting title in him.

Defendant, Harry A. Spencer, disclaims any interest in the property in controversy. The defendants, Katherine R. Shankland and Jeane Shankland, claim title to the property set forth in the contract between W. R. Shankland and Clifford L. Rein vested in them and the other heirs at law of W. R. Shankland and Celia R. Shankland, deceased, and pray judgment accordingly.

The record discloses that Fannie E. Griggs, a mental incompetent, was placed under guardianship August 10, 1920. On or about June 29, 1927, Clifford L. Rein was appointed guardian of her person and estate. On August 24, 1927, Katherine R. Shankland became the owner of the property in controversy. August 22, 1927, the guardian was authorized by the county court to loan Katherine R. Shankland $2,500, taking a first mortgage on the property as security. Subsequently, on May 1, 1928, the loan was increased, by the authorization of the county court, to $3,500, and a first mortgage

on the property was taken as security. On March 2, 1931, Katherine R. Shankland was unable to pay the mortgage and offered to convey the property to the estate of the ward. By order of the county court March 3, 1931, the guardian was authorized to accept the conveyance, and to allow Katherine R. Shankland to occupy the premises rent free for one year from September 1, 1930, the date of the deed tendered by Katherine R. Shankland. The record shows a quitclaim deed from Katherine R. Shankland to Fannie E. Griggs, dated September 1, 1930. The guardian made application to the county court April 27, 1931, to mortgage the property for $1,800, which application was approved by an order of the county court on April 27, 1931. The Conservative Mortgage Company, a corporation, Trustee, became the mortgagee. On July 9, 1934, this mortgage was released as paid, and a mortgage for $800 was placed on the property and filed June 22, 1934, running to the same mortgagee.

During July 1939, a contract was entered into by and between Clifford L. Rein and W. R. Shankland. This contract appears in the record as exhibit 5, and will hereafter be referred to in the opinion as the contract. The contract provides, in substance, that W. R. Shankland was to pay $100 down at the time of entering into the contract, and the balance of $300 in 90 days, and to enter into possession of the premises without payment of rent as provided therein; in addition, to assume and agree to pay an $800 first mortgage, a lien on the property, and have the privilege to designate the person who should take title. The contract was signed personally by Clifford L. Rein. The ward held the title to the property and Clifford L. Rein was, at the time of entering into the contract and up to about April 1, 1943, the duly appointed, authorized, and acting guardian of Fannie E. Griggs, incompetent.

On November 20, 1939, the guardian filed an application in the county court, which appears in the record

as exhibit 9, calling the court's attention to the fact that the property was encumbered by an $800 mortgage, as heretofore mentioned, which was past due as of May 1, 1939; that the mortgagee refused to renew the mortgage and the estate had insufficient funds to pay the same; further, that the property had not been worth to exceed $1,500 and was worth $1,200 at that time, and would require the expenditure of $150 per year for upkeep, and would not rent for an amount to exceed $12.50 per month; that W. R. Shankland would bid $1,200 at any foreclosure sale of the property and pay the same; that this amount would pay the mortgage and delinquent interest and leave $150 to $200 to the ward's estate; prayed the court to approve the action of the guardian in behalf of the defendants in the foreclosure action and the filing of an answer in the form of a general denial, and to direct the guardian not to proceed further in resisting the foreclosure. The county court, on November 21, 1939, by order, approved the application. The order recited that there was a bidder available who would pay $1,200 for the property.

The guardian testified the mortgagee was going to bid the property in at the foreclosure sale for the amount as stated in the contract, and W. R. Shankland was to make a new mortgage and pay off the existing mortgage of $800 and thereby acquire title to the property. Under the circumstances the Shanklands were not made parties to the foreclosure action. The attorney for the mortgagee testified that the guardian informed him that W. R. Shankland was to bid at the sale and pay $1,200. The attorney bid for Celia R. Shankland as a party to take over the title, as provided for in the contract and as the guardian requested. The guardian testified that he complained of the attorney for the mortgagee bidding in behalf of Celia R. Shankland, as that was not the deal.

Prior to taking possession pursuant to the contract,

the Shanklands paid rent for the premises in the amount of $12.50 per month.

W. R. Shankland, in his lifetime, paid the $400 as provided for by the contract and as shown by the endorsements thereon, the last one being September 5, 1939. He designated his wife, Celia R. Shankland, as the person to take title to the property. He died prior to February 1940, and his estate has not been administered. Celia R. Shankland died subsequent to June 4, 1941, but in the year of 1941. Her estate has not been administered. Six adult daughters were the sole and only heirs at law of both W. R. and Celia R. Shankland. Some of the heirs continued to live in the property until Jeane Shankland entered the military service in 1943.

The action to foreclose the $800 mortgage was filed October 13, 1939. Decree of foreclosure was entered December 19, 1939. The property was sold to Celia R. Shankland for $1,200 on February 27, 1940. Thereafter, on December 21, 1940, a motion was filed to set aside the sale, for failure to complete the purchase. On June 4, 1941, Celia R. Shankland filed a motion to confirm the sale in her, supported by an affidavit of her attorney, Harry A. Spencer, setting forth that the terms of the contract had been complied with, and it was agreed, in order to perfect a title to the premises, the guardian would foreclose the $800 mortgage; further, that Celia R. Shankland was ready and willing, and had been since September 5, 1939, which was the date the last payment was endorsed on the contract, to execute a mortgage in the amount of $800 on the premises when the same were conveyed to her free and clear of all encumbrances. The motion to confirm the sale in Celia R. Shankland was overruled, and the motion to set aside her bid was sustained.

It appears from the record that some six months to a year after the mortgage foreclosure was started, Spencer had a conference with a representative of the mortgagee, the attorney foreclosing the mortgage, and

the guardian, wherein he informed them of the willingness of his clients to complete the obligations of the contract and to pay the $800 in cash for the benefit of the bondholders, rather than secure another loan. This was agreeable to all the parties, but failed on account of the guardian's inability to obtain funds to pay the taxes.

On January 9, 1942, exceptions were filed against the guardian's final report by a next friend of the ward, requesting that the guardian be surcharged for improvident handling of the ward's estate. On the same day the county court entered a decree surcharging the guardian in the sum of $6,607.53. Of this amount $2,765.88 was the loss the estate suffered by the guardian's handling of the property in controversy. An appeal was taken and the judgment was settled for $6,500. The surety on the guardian's bond paid the judgment. Exhibit 14 appearing in the record is the order of the county court approving and directing settlement of the judgment. It provides in part that the Western Surety Company, the surety on the guardian's bond, agreed to assign or quitclaim any interest it might acquire by equitable subrogation or otherwise in and to the property here involved.

Referring again to the mortgage foreclosure proceedings, Jeane Shankland, through her attorney, filed a motion and affidavit on July 24, 1943, requesting the appointment of a receiver. The affidavit set forth the willingness of the Shankland heirs to comply with the contract and pay the $800 mortgage in cash. Apparently this motion was overruled.

On November 23, 1943, Spencer, as attorney for the Shankland heirs, filed in the register of deeds office an affidavit sworn to by him, wherein he set forth the contract entered into between W. R. Shankland and Clifford L. Rein.

The plaintiff became interested in the property in January 1943, and contacted relatives of the Shanklands

who referred him to Spencer who informed him the Shanklands had an interest in the property and that he might be able to obtain a quitclaim deed from them for $150. The plaintiff did not accept the offer.

When the Shankland girls left the property, they left some clothes, books, and a small amount of furniture. The plaintiff, with the assistance of Spencer who had the key to the house, looked the house over. Nobody was living in it at the time, and the front door was locked. Spencer referred the plaintiff to Clifford L. Rein. The plaintiff asked Rein the price of the property and was informed that it was $1,500. He offered $1,300, which was accepted and paid to the guardian ad litem of the estate of Fannie E. Griggs, incompetent. The plaintiff made a down payment of $300 in May or June of 1943, and paid the balance in September 1944, by procuring a loan. Out of this $1,300, eight hundred dollars was used to pay the bondholders under the mortgage—the remainder to obtain quitclaim deeds from Rein and the surety company. Clifford L. Rein, the former guardian of Fannie E. Griggs, incompetent, and his wife conveyed by quitclaim deed to the plaintiff April 7, 1943. The Western Surety Company conveyed by quitclaim deed to the plaintiff April 2, 1943.

Spencer testified he fully informed the plaintiff with respect to the interest of his clients, their possession of the premises, and the contract between Rein and Shankland.

Apparently, from the date of making the contract, no rent nor taxes was paid by the Shanklands for the property.

The plaintiff, as the highest bidder, purchased the property at the foreclosure sale on September 12, 1944, for $85.50. Sheriff's deed was made, executed, and delivered to the plaintiff October 2, 1944. The plaintiff went into possession of the property April 15, 1944.

The foregoing constitutes a resume of the evidence upon which the trial court quieted title in the plain-

tiff as prayed in his petition; found that the contract of sale was null and void and unenforceable; further found that by reason of the proceedings against Clifford L. Rein for losses sustained by the estate of the ward, Clifford L. Rein or his surety acquired interest in the property in controversy, and the plaintiff derived his title through deeds of conveyance from Clifford L. Rein or the surety, and also from the foreclosure of the mortgage. From this judgment, the defendants appeal.

For convenience, the defendants will hereinafter be referred to as the appellants, and the plaintiff as appellee.

Appellants contend the trial court erred in finding that the appellee's title in and to the real estate involved in this action should be quieted and confirmed against the claims of the appellants and all persons whomsoever, and in finding that the appellants are claiming under a void and unenforceable contract.

In considering this assignment of error, it appears to this court that any interests the appellants might have in the property in controversy must be derived from exhibit 5 appearing in the record and heretofore referred to as the Rein-Shankland contract.

It is true, as suggested by the appellants, the relation of a guardian to his incompetent ward is tantamount to a trust relationship. However, there are distinctions between the rights, powers, and duties of a guardian and those of a trustee, in that a trustee has title to the trust property with an equitable interest in the beneficiary, whereas a guardian has no title but only certain powers and duties to deal therewith for the ward's benefit, the ward having the title. See Guardianship of Paulsen, 229 Wis. 262, 282 N. W. 36.

The appellants rely on exhibit 9, a petition in the county court, as constituting a presentation of the contract, exhibit 5, to the court, and likewise rely on exhibit 10 which it is claimed by the appellants is an order of the county court approving the contract. An

examination of the two exhibits, the substance of which is heretofore set forth, discloses that the contract and the terms thereof were never called to the attention of the county court, and there is no authorization of that court permitting the guardian to enter into such contract.

Regardless of whether or not the contract was approved by the county court, in this state before a· guardian of an incompetent ward can sell the real estate of his ward it is necessary to obtain a license to do so from the district court. Section 38-601, R. S. 1943, provides: "When the income of the estate of any persons under guardianship, whether a minor, insane person, idiot, spendthrift or other person, shall not be sufficient to maintain the ward and his family or to educate the ward, when a minor, or the · children of such insane person or other person under guardianship, or when the personal property in the hands of the guardian or any person under guardianship shall be insufficient to pay all of the debts of his ward, with charges of managing his estate, the guardian of any such person may sell the real estate of his ward for any of the purposes enumerated above, upon obtaining a license therefor and proceeding therein as provided in section 38-601 to 38-643."

We deem it unnecessary to set forth all the statutory provisions governing this subject matter. However, section 38-607, R. S. 1943, provides: "In order to obtain a license for such sale, the guardian shall present to the district court, or judge thereof in vacation, of the county in which he was appointed guardian, a petition therefor, setting forth the condition of the estate of his ward, and the facts and circumstances on which the petition is founded, tending to show the necessity or expediency of a sale, which petition shall be verified by the oath of the petitioner."

The record in the instant case fails to disclose that the guardian either attempted to or in any manner complied with the foregoing statutory provisions.

Section 38-613, R. S. 1943, provides in part: "The license shall order the guardian to sell described land or interest in land at public sale; * * *" and contains a provision that the land may be sold at private sale where the interest of the ward in and to the land to be sold is of less value than the sum of five hundred dollars, which would not be the situation in the case at bar.

It is obvious that the statutes heretofore referred to expressly provide the manner and purposes for which a guardian may sell his ward's real estate.

"It is a general rule that a guardian has no authority to sell real estate of his ward without an order of court, in the absence of a statute expressly or by implication conferring the power or authority otherwise conferred upon him, as by will." Anno. 108 A. L. R., p. 944. See, also, 39 C. J. S., Guardian and Ward, § 82, p. 128; 28 C. J., Guardian and Ward, § 219, p. 1133.

In the instant case, W. R. Shankland cannot be said to be an innocent purchaser. He and his family had occupied the premises prior to the making of the contract of sale, and obviously knew the relation of the guardian and ward with reference to the property for which he contracted. Likewise, these appellant heirs knew the facts and circumstances with reference to the guardianship, and the property here involved. There was enough upon the face of this record to have deterred any prudent man from investing his money in this property.

"One who purchases real estate at a guardian's sale, or purchases from the vendee of that sale, must take notice at his peril of the authority of the guardian to make the sale. The doctrine of *caveat emptor* applies to purchasers at guardians' sales." Bachelor v. Korb, 58 Neb. 122, 78 N. W. 485. This case held that a guardian's sale of lands of his ward is void unless before such sale a guardian executes a bond as required by statute.

If, as held in Bachelor v. Korb, *supra,* the doctrine

of *caveat emptor* applies to purchasers at guardian's sales, most assuredly the doctrine would apply to a contract for the sale of the ward's property, as shown by the facts in the instant case.

"A guardian having no power to sell cannot make a valid contract to sell his ward's lands, and if without authority he assumes to make such a contract it cannot be specifically enforced, nor can damages be awarded for its breach." 39 C. J. S., Guardian and Ward, § 82, p. 129.

In 25 Am. Jur., Guardian and Ward, § 124, p. 78, it is said: "It is, therefore, a firmly established general rule that a guardian has no authority to sell real estate of his ward without an order of court, in the absence of a statute expressly or by implication conferring the power or authority otherwise conferred upon him, as by will. A contract by a guardian to sell his ward's land in advance of legal authority is contrary to public policy and void. * * * In most jurisdictions guardians' sales are provided for by statute, and it is generally settled that courts having jurisdiction over the estates of infant and incompetent wards have the power, either by virtue of their general jurisdiction or under express statutory provisions, to authorize the sale of realty belonging to a ward, if necessary or if the welfare of such person will thereby be promoted."

"And in Le Roy v. Jacobosky (1904) 136 N. C. 443, 48 S. E. 796, 67 L. R. A. 977, the court held that a contract by a guardian to sell his ward's land, in advance of legal authority, was contrary to public policy and void.

"Where a statute provided that guardians could sell the real estate of a ward only upon the order of a court of competent jurisdiction, it was held in Nichols v. Bryden (1912) 86 Kan. 941, 122 P. 1119, that a guardian's executory contract for the sale of land, not approved by the Probate Court, had no legal standing.

"And in Cox v. Burrus (1922) 198 Ky. 48, 248 S. W.

239, it was held that a guardian could not make a valid contract for the sale of his ward's real estate for a stipulated amount, upon the condition that he would obtain a decree of court for the sale of the property." 108 A. L. R. 950.

"In Morrison v. Kinstra (1877) 55 Miss. 71, the court said: 'It is ultra vires of the powers of the guardian to bind the title and interest of the ward by a contract to sell. Such an agreement contravenes the policy of the law. The title of the ward can only be divested by proper decree and sale at public vendue, whether the interest of the ward be legal or equitable.' " 108 A. L. R. p. 949.

Other cases bearing directly upon this proposition of law are: Downing v. Peabody, 56 Ga. 40; Gaylord v. Stebbins, 4 Kan. 42; Worth v. Curtis, 15 Me. 228; Morris v. Goodwin, 1 Ind. App. 481, 27 N. E. 985; Funk v. Rentchler, 134 Ind. 68, 33 N. E. 364; Joseph v. Belcher, (Mo. App.) 74 S. W. 2d 483; Zander v. Feely, 47 Ill. App. 659; Smith v. Moore, 178 N. C. 370, 100 S. E. 702; Thacker v. Henderson, 63 Barb. (N. Y.) 271; Smith v. Rockett, 79 Okla. 244, 192 P. 691.

"Void" means nonenforceable, and without legal effect incapable of ratification. A void contract is one without legal effect or force. See King v. King, 63 Ohio St. 363; City of Litchfield v. Litchfield Water Sup. Co., 95 Ill. App. 647; Bishop on Contracts (2d Ed.) § 611, p. 259.

"A thing is void which is done against law, at the very time of doing it, and where no person is bound by the act." Anderson v. Roberts, 18 John. (N. Y.) 515. See, also, Winfield, Adjudged Words and Phrases, p. 633.

If the contract was void for the reason assigned, the court would not enforce a breach of it, but leave the parties where they found them. See York v. Merritt, 77 N. C. 213; Le Roy v. Jacobosky, *supra.*

The method adopted and pursued by the guardian in attempting to vest title to the real estate of the ward in the vendee under the contract of sale by having the

mortgage of the Conservative Mortgage Company fore-closed, discloses he apparently believed the contract was void and of no legal force and effect. We conclude, from the facts and circumstances here presented, the contract designated as exhibit 5 is absolutely void, has no legal force or effect, and is incapable of ratification.

The following authorities are also applicable and decisive of this appeal: "The doctrine of subrogation is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice and to do equity in the particular case under consideration. It does not rest on contract, and no general rule can be laid down which will afford a test in all cases for its application." Fender v. Reed, 143 Neb. 911, 12 N. W. 2d 98.

Whether the doctrine of subrogation is applicable to a particular case depends upon the peculiar circumstances of such case. See Fender v. Reed, *supra*. See, also, Equitable Life Assurance Society v. Person, 135 Neb. 800, 284 N. W. 260.

A surety on guardian's bond was held subrogated to rights of ward. See Brovan v. Kyle, 166 Wis. 347, 165 N. W. 382.

"Sureties having satisfied the claims of obligees on a guardian's bond are subrogated to the rights of the latter, * * * ." Woerner, American Law of Guardianship, § 46, p. 156. See, also, Sheldon on Subrogation, (2d Ed.) § 88, p. 138; 21 R. C. L., Principal and Surety, § 155, p. 1118.

"If the surety has been compelled to make good a defalcation of the guardian, he is subrogated to any right of the ward against one who assisted in the defalcation." 25 Am. Jur., Guardian and Ward, § 203, p. 127, and cases cited under note 15.

In the instant case, on June 9, 1942, the county court decreed that the guardian of Fannie E. Griggs, incompetent, or the Western Surety Company, the surety on the guardian's bond, pay into court $6,607.53, or to a suc-

cessor guardian to be appointed by the court. On appeal to the district court the case was not tried, but the judgment rendered in the county court was settled by the surety in the amount of $6,500. On April 2, 1943, the county court entered an order approving and directing settlement, which was perfected according to such order. The amount paid to the ward's estate by the surety for the loss accruing to the property in controversy caused by the guardian's defalcation, was an amount in excess of the value of the property, the property at the time, as shown by the record, not exceeding a value of $1,200 to $1,500, while the surety paid an amount a trifle in excess of $2,400 on this item, thus making the ward's estate whole in such respect.

We believe that under the circumstances equity and good conscience require that the surety be subrogated to any rights or interests the ward may have had in such property and, as provided for in the order approving the settlement, may quitclaim any right or interest it may have obtained by equitable subrogation. Thereafter, the surety, by quitclaim deed, deeded what interest it may have had in the property to the appellee, as did the former guardian. Further, the appellee received a sheriff's deed by virtue of the mortgage foreclosure sale. Under the circumstances, we conclude that the appellee is entitled to a decree quieting title in him to the property here involved.

In view of our holding, it becomes unnecessary to determine other legal questions presented in this appeal.

AFFIRMED.